USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/2/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

MARYELLEN NOVAK,

        Plaintiff,

   -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT OFFICER ASHLEY
MAHARAJ, in her individual capacity; NEW YORK
CITY POLICE DEPARTMENT OFFICER QASIM
MUSHTAQ, in his individual capacity; NEW YORK
CITY POLICE DEPARTMENT OFFICERS "JOHN
DOE" #1–5, in their individual capacities; NEW
YORK CITY POLICE DEPARTMENT DEPUTY
INSPECTOR NEIL ZUBER, in his individual
capacity,

        Defendants.

———————————————————————— x

25-cv-3734 (CM)

**OPINION AND ORDER**

McMahon, J.:

Plaintiff Maryellen Novak brings this action against the City of New York (the "City") and several New York City Police Department officers (the "Defendant Officers") (collectively, "Defendants"). She asserts federal constitutional claims pursuant to 42 U.S.C. § 1983 and related claims under New York state law arising from her arrest following a protest held in Manhattan on May 7, 2024.

Plaintiff alleges that the Defendant Officers violated her rights under the Fourth and Fourteenth Amendments by arresting her without probable cause and retaliated against her for engaging in protected speech and expressive activity, in violation of the First Amendment. Plaintiff also asserts a New York common-law false arrest claim against the City of New York and

1

the Defendant Officers, as well as a claim against the City alleging negligent hiring, training, and supervision.

Defendant Officers Ashley Maharaj, Qasim Mushtaq, and Neil Zuber move for summary judgment dismissing Plaintiff's federal constitutional claims on the ground of qualified immunity. Defendants also move to dismiss Plaintiff's state-law claims for failure to state a claim.

For the reasons set forth below, Defendants' motion for summary judgment on the ground of qualified immunity is DENIED. Defendants' motion to dismiss is DENIED as to Plaintiff's New York common-law false arrest claim and GRANTED as to Plaintiff's negligent hiring, retention, training, and supervision claim against the City. This case will proceed to full discovery.

## I.    BACKGROUND

The Court is asked to resolve a motion for summary judgment dismissing Plaintiff's federal constitutional claims on the ground of qualified immunity. This is not a pre-answer motion, which is the procedural posture this Court prefers for resolving qualified immunity questions. *See* Individual Rules, at V.F.4.[1]  Defendants have filed an answer. However, only Plaintiff has been deposed; there has been no other party discovery beyond Plaintiff's deposition and the production of the body-worn camera footage.

At this juncture, the motion for qualified immunity is governed by this Court's Individual Rules governing qualified immunity motions. Individual Rules, at V.F.4. Accordingly, the Court considers the well-pleaded allegations of the complaint, as supplemented by Plaintiff's deposition testimony. The Court does not credit Defendants' assertions to the extent they conflict with

---

[1] A defendant's entitlement to qualified immunity presents a question of law for the Court; however, where the facts material to that determination are disputed, those factual disputes must be resolved by a jury. *Kerman v. City of New York*, 374 F.3d 93, 119 (2d Cir. 2004).

Plaintiff's account, except insofar as they are corroborated by undisputed record evidence (including video).

The parties dispute whether the Court may consider the body-worn camera footage of the incident. Plaintiff contends that the footage may not be considered; Defendants contend that it may. The Court agrees with Defendants. On a motion for summary judgment asserting qualified immunity, video evidence may properly be considered, even where testimonial evidence from defendants is not.

The Supreme Court has repeatedly relied on video evidence in resolving qualified-immunity motions and has held that such evidence can be dispositive where it "blatantly contradict[s]" a party's version of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007). It would therefore be inappropriate to refuse to consider the body-worn camera footage in connection with Defendants' qualified-immunity motion. As discussed below, however, the video evidence in this case does not support Defendants' contention that they are entitled to qualified immunity as a matter of law. *See Scott*, 550 U.S. at 380.

Plaintiff argues that Defendants' reliance on the video footage is improper. *See* Dkt. No. 25, Pl.'s Mem. L. Opp'n Defs.' Mot. Summ. J. & Mot. Dismiss, at 20 n.4 (citing *Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000)). Plaintiff's reliance on *Friedl* is misplaced. *Friedl* addresses the materials a court could consider on a pre-answer motion to dismiss under Rule 12(b)(6). It has no application to a post-answer motion for summary judgment asserting qualified immunity.

That said, it would not be appropriate to consider the video footage when resolving Defendants' motion to dismiss Plaintiff's state-law claims under Rule 12(b)(6). On such a motion, the Court is limited to the four corners of the complaint and any documents "integral to" or "relied

upon" in drafting it. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Plaintiff did not rely on the body-worn camera footage in drafting her complaint; rather, Defendants rely on it in crafting their defense. The Court will not consider the video footage in connection with Defendants' Rule 12(b)(6) motion.

### a. The Protest and Officers' Arrival

The following facts are drawn from the complaint, from Plaintiff's deposition testimony, and the body-worn camera footage. To the extent the parties' Rule 56.1 statements are consistent with those sources, they are cited. Where facts are disputed by the parties, the Court notes the nature of the dispute and, for purposes of Defendants' summary-judgment motion, construes genuinely disputed facts in Plaintiff's favor. *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019).

A protest was organized by individuals affiliated with Columbia University Apartheid Divest ("CUAD"), a student group advocating for Columbia University's divestment from Israel. The protest was scheduled to occur during the morning hours near East 72nd Street and Park Avenue, in front of the residence of a Barnard College trustee.

Plaintiff Maryellen Novak agreed in advance to attend the protest in a volunteer capacity to assist with safety and de-escalation as a safety marshal. Plaintiff testified that, in her understanding, a safety marshal's role is to help ensure the safety of protest participants, fellow marshals, and members of the public. Dkt. No. 19-1, Novak Dep. Tr. 20:7–11. Although the claims in this action arise from events that occurred after the protest concluded, the Court briefly describes the protest itself for context.

On the morning of May 7, 2024, Plaintiff, several other volunteer safety marshals, and approximately 15 to 20 protesters met in Central Park at approximately 8:00 a.m. for a de-

4

escalation training. After the training, at approximately 8:30 a.m., the group walked to the protest location near East 72nd Street and Park Avenue. The protest began at approximately 9:00 a.m. Plaintiff testified that the protest took the form of a "walking picket," a common form of protest in which participants move in a circular motion in an area where they do not interfere with pedestrians. Dkt. No. 18, ¶ 8; Dkt. No. 22, ¶ 8; Dkt. No. 19-1, Novak Dep. Tr. 21:22–22:3; 32:17–20. Plaintiff wore an identifiable yellow, crossing-guard-style vest.

Officers Ashley Maharaj and Qasim Mushtaq arrived at the scene at approximately 9:15 a.m. Dkt. No. 18, ¶ 6; Dkt. No. 22, ¶ 6; Dkt. No. 19-1, Novak Dep. Tr. 38:1–15. Plaintiff introduced herself to Officers Maharaj and Mushtaq and explained that she was serving as a safety marshal and police liaison for the protest. Dkt. No. 19-1, Novak Dep. Tr. 38:18–39:17. The walking picket lasted approximately forty-five minutes and ended at around 9:45 a.m.

The events giving rise to Plaintiff's claims occurred as the protest concluded and the group began to leave the area.

### b. The End of the Protest and the Group's Departure

After the protest ended, the group began walking west on East 72nd Street toward Park Avenue. Dkt. No. 1, Compl. ¶ 41. They were on the south side of the street.

When the group had a walk signal at the intersection of East 72nd Street and Park Avenue, the picketers began crossing Park Avenue. They were walking within the crosswalk. Plaintiff followed the group as it crossed Park Avenue; Officers Mushtaq and Maharaj followed as well.

As the group reached the first median and began crossing the next segment of Park Avenue, an SUV turned into the crosswalk and began heading toward them. *Id.*, ¶¶ 43–44. Despite the presence of pedestrians lawfully crossing with the walk signal, the driver continued driving into the crowd. *Id.*, ¶¶ 44–45.

According to the complaint, as the vehicle drove into the group, Plaintiff extended her hands in front of her in a gesture to stop the car from running over the protesters. *Id.*, ¶ 46. The SUV continued moving forward, striking Plaintiff's outstretched arms and then her body. *Id.*, ¶ 47. Plaintiff was carried briefly on the hood of the vehicle before being thrown off when the driver abruptly stopped. *Id.*

At her deposition – taken pursuant to this Court's Individual Rules governing qualified-immunity motions – Plaintiff testified, consistent with her complaint, that the group entered the crosswalk with the walk signal and that the vehicle continued moving into the crosswalk while pedestrians were present. She further testified that she moved toward the vehicle only after she "heard high-pitched screams and believed that [the driver] ran over someone on the other side," and that she was attempting to prevent the vehicle from striking additional pedestrians. Dkt. No. 19-1, Novak Dep. Tr. at 58:1–12. The vehicle instead struck Plaintiff, causing her to fall backwards onto the street. *Id.*; *see also* Dkt. No. 19-2, 00:46–00:52.

Defendants predictably dispute Plaintiff's version of events. According to Defendants' Rule 56.1 statement, Plaintiff, whom Defendants assert was standing on the median, ran into the vehicle's path, stood directly in front of it with her arms outstretched, and struck the hood with her hands multiple times, thereby blocking the vehicle's path forward. Dkt. No. 18, Defs.' Rule 56.1 Statement, ¶ 20. Defendants further assert that any contact between the vehicle and Plaintiff occurred only after Plaintiff intentionally positioned herself in front of the vehicle. *See id.*, ¶¶ 20–21. Because this motion is governed by the Court's Individual Rules, the Court does not credit Defendants' conflicting version of events unless it is established by undisputed video evidence; the dispute is therefore noted but not dispositive at this stage.

The parties do not dispute that the vehicle entered the crosswalk, that it made contact with Plaintiff, and that Plaintiff fell backwards onto the street as a result. Dkt. No. 19-1, Novak Dep. Tr., at 63:4–13. There is no claim that Plaintiff caused any damage to the vehicle. Dkt. No. 26, Defs.' Resp. Pl.'s 56.1 Statement, ¶ 47.

### c. Plaintiff's Arrest and Detention

After Plaintiff was struck by the SUV, Defendant Mushtaq approached her and asked whether she needed medical attention. Plaintiff responded that she did. Dkt. No. 1, Compl., ¶ 60.

Minutes later, Plaintiff explained to Defendant Mushtaq that she and the protesters had the walk signal when they were crossing Park Avenue. *Id.*, ¶ 61. Defendant Mushtaq responded that she should not worry about that because he had seen "the entire thing." *Id.*

When EMTs arrived shortly thereafter, Defendant Maharaj told them that Plaintiff was "trying to stop that car from hitting [the protesters]" when she was struck. *Id.*, ¶ 62. Defendant Mushtaq explained to an EMT that Plaintiff had been "ran over by a car" while she "was just walking." *Id.*, ¶ 63.

Plaintiff was led into an ambulance for medical treatment. *Id.*, ¶ 64. Inside the ambulance, Defendant Maharaj, Defendant Mushtaq, and Defendant Doe #1 approached Plaintiff. *Id.* An EMT asked whether Plaintiff's vitals could be taken before she was handcuffed, but the officers refused. *Id.*, ¶ 65. Defendant Maharaj then handcuffed Plaintiff. *Id.*, ¶ 66. Plaintiff asked, "Can I ask why? What charge?" Dkt. No. 24-1, 72:6–7; Dkt. No. 19-2, 10:30–33. Officer Mushtaq did not respond. *See* Dkt. No. 19-2, 10:33–12:38.

After she was transported to a hospital, Plaintiff again asked Officer Maharaj to explain the charges against her. Dkt. No. 24-1, Novak Dep. Tr., 82:2. Officer Maharaj again stated that she did not know why Plaintiff had been arrested. Dkt. No. 1, Compl. ¶ 75. Officer Maharaj remarked that the case would likely be "DP'd." Dkt. No. 24-1, Novak Dep. Tr. 82:8–16.

7

Later that evening, Officer Mushtaq informed Plaintiff that the Manhattan District Attorney's Office had declined to prosecute her. Dkt. No. 1, Compl., ¶ 84; Dkt. No. 24-1, Novak Dep. Tr., 98:1–3. Plaintiff was then released, having never been issued a summons or desk appearance ticket and never having been informed of the basis for her arrest. *Id.*, ¶¶ 84, 92.

## II.     LEGAL STANDARDS

### a.  Rule 12(b)(6) Standard

To survive dismissal, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

Two "working principles" guide this inquiry. *Id.* at 678. *First*, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Accordingly, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id. Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 679. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

Thus, when reviewing a motion to dismiss, the Court may begin by identifying allegations that are no more than legal conclusions and therefore "not entitled to the assumption of truth." *Id.* at 679. Where a complaint contains well-pleaded factual allegations, the Court assumes their

veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.* If the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief. *Id.*; Fed. R. Civ. P. 8(a)(2).

### b. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021). That obligation, however, applies only where there is a genuine dispute of material fact. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

Accordingly, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; rather, it must come forward with specific evidence showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Where the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is appropriate. *Id.* at 587.

However, because qualified immunity is intended to protect government officials not only from liability but from the burdens of litigation, including discovery, such motions are often made early and on an incomplete record. In this Court, they are therefore governed by the special

9

procedures set forth in the Individual Rules, which require the Court to credit the plaintiff's version of disputed facts unless contradicted by undisputed record evidence. Those rules are discussed below.

## III.    DISCUSSION

### a.   Defendants' Motion for Summary Judgment Dismissing the Federal Claims on the Ground of Qualified Immunity Is Denied in its Entirety

Defendants move for summary judgment on Plaintiff's Fourth Amendment false arrest claim on the ground that they are entitled to qualified immunity. Their argument does not turn on uncertainty about what the law requires, but on competing accounts of the facts surrounding Plaintiff's arrest. Proceeding on Plaintiff's version of events, as the Court must at this stage, Defendants are not entitled to qualified immunity.

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011), and seeks to preserve a balance between the "vindication of citizens' constitutional rights and . . . public officials' effective performance of their duties," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (internal quotation marks and citation omitted). Qualified immunity, however, is limited: it only shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Under the framework articulated in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), courts evaluating a claim of qualified immunity consider two questions: (1) whether, *taken in the light most favorable to the plaintiff,* the facts alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right was clearly established at the time of the challenged conduct. Thus, the operative inquiry is "whether it would be clear to a reasonable officer that his conduct

10

was unlawful in the situation he confronted." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). This inquiry presupposes a settled version of the facts against which the law is applied.

In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court did not abandon this two-pronged framework; it rejected only *Saucier*'s requirement that courts address those prongs in a rigid, mandatory order. After *Pearson*, courts retain discretion to decide which prong to address first, depending on the circumstances of the case. *Id.* at 242. But *Pearson* reaffirmed that both prongs remain part of the qualified immunity analysis, and it does not authorize courts to resolve qualified immunity by crediting a defendant's version of disputed facts or by collapsing the inquiry into a merits determination. *See id.* at 232.

The Second Circuit has repeatedly held that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). When the existence of arguable probable cause depends on which version of events is credited, the dispute is purely factual, not legal. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997). In that circumstance, the Court may not resolve the dispute by choosing between competing narratives or take the issue away from the jury.

This Court's Individual Rules governing qualified-immunity practice reflect those principles. The Individual Rules explicitly caution that qualified immunity should not be invoked when the argument is, in substance, that the officer is entitled to judgment "because he did nothing wrong." Individual Rules, at V.F.4. Qualified immunity "shields a municipal officer from liability, not because s/he did nothing wrong, but because s/he could not possibly have known that what s/he was doing was wrong, due to the unsettled state of the law relating to those facts." *Id.*

11

Thus, where a defendant's motion depends on accepting the officer's version of contested events – rather than on uncertainty in the law – the argument sounds in the merits, not in qualified immunity.

The Second Circuit has drawn the same line. In *Stephenson v. Doe*, 332 F.3d 68, 76, 78–79 (2d Cir. 2003), the court explained that qualified immunity is "more than a simple defense—it is an entitlement not to stand trial or face the burdens of litigation," but it protects only reasonable mistakes "as to what the law requires." But when material factual disputes bear on arguable probable cause, summary judgment on qualified immunity grounds is inappropriate. *Id.* at 77; *see also Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring) (stating that summary judgment not permitted where the case "turns on which of two conflicting stories best captures what happened on the street").

That is precisely the situation presented here.

### i. Plaintiff's Fourth Amendment False Arrest Claim

Defendants first move for summary judgment dismissing Plaintiff's false arrest claim under the Fourth Amendment solely on the ground that they are entitled to qualified immunity because they purportedly had "arguable probable cause" to arrest her. The Court therefore does not decide whether Defendants in fact had probable cause on the merits. The only question presented is whether, crediting Plaintiff's version of events, any reasonable officer could have believed that probable cause existed. On this record, no reasonable officer could have done so, and Defendants are therefore not entitled to qualified immunity.

The Fourth Amendment, applicable to the States via the Due Process Clause of the Fourteenth Amendment, provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" Consistent with this constitutional guarantee, it has long been clearly

established that the Fourth Amendment prohibits arrests unsupported by probable cause. *See Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991); *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008). An officer has probable cause to arrest when the facts and circumstances known to the officer at the time of the arrest would lead a person of reasonable caution to believe that the arrestee has committed an offense. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

Where, as here, Defendants invoke qualified immunity, however, the relevant inquiry is not whether probable cause actually existed, but whether the officers had arguable probable cause to arrest Plaintiff. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). In the context of a Fourth Amendment false arrest claim, the Second Circuit has made clear that the qualified-immunity analysis is conducted through the doctrine of "arguable probable cause." *See Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zellner*, 494 F.3d at 369 (citation omitted); *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). But, "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins*, 478 F.3d at 87.

This qualified-immunity inquiry proceeds on Plaintiff's version of events, as pleaded in the complaint and supplemented by her deposition testimony. Defendants are not entitled at this stage to advance their own competing narrative. *See* Individual Rules, at V.F.4.

On Plaintiff's version of the facts, Defendants lacked even arguable probable cause to arrest her. Plaintiff alleges that, at the moment of arrest, the officers themselves were unable to articulate any basis for the arrest and described Plaintiff's conduct to third parties in non-criminal terms. While she was being handcuffed inside the ambulance, Plaintiff asked why she was being arrested, and "Defendant Mushtaq replied that they would tell her later, seemingly unable to articulate the grounds for her arrest." Dkt. No. 1, Compl., ¶ 69. Plaintiff further alleges that she was "never informed of the charges or the reason for her arrest," either at the scene or during her many hours in custody. *Id.*, ¶ 92.

Plaintiff further alleges that, immediately after the incident, Defendants affirmatively characterized Plaintiff as a pedestrian victim rather than a perpetrator of any offense. Defendant Maharaj told emergency medical personnel that Plaintiff was "trying to stop that car from hitting [the protesters]" when she was struck, *id.*, ¶ 62, and Defendant Mushtaq explained to an EMT that Plaintiff had been "ran over by a car" while she "was just walking," *id.*, ¶ 63. Later, at the hospital, Defendant Maharaj again stated that she had seen the car drive into Plaintiff and "did not know why Ms. Novak was arrested." *Id.*, ¶ 75.

If officers acknowledge that they do not know the basis for an arrest – or describe the arrestee to third parties as a pedestrian victim – no reasonable officer could believe, mistakenly or otherwise, that probable cause existed. Qualified immunity protects reasonable mistakes of law or fact; it does not shield arrests where, on Plaintiff's account, the officers could not identify any facts supporting a reasonable belief that she had committed an offense. *See Saucier*, 533 U.S. at 206. On Plaintiff's version of events, Defendants did not make a reasonable but mistaken judgment about whether Plaintiff's conduct satisfied the elements of a crime; they arrested her without identifying any offense she was believed to have committed.

That alone is sufficient to deny Defendants' motion for dismissal on the ground of qualified immunity at this stage.

Even if the Court were to assume arguendo that Defendants had some offense in mind, and considers the statute they now invoke – disorderly conduct under New York Penal Law § 240.20(5) – the result would be the same. Section 240.20(5) provides that a person is guilty of disorderly conduct when, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," she "obstructs vehicular or pedestrian traffic." New York courts have long construed this provision narrowly, particularly in the context of protests and pedestrian activity. To establish probable cause under § 240.20(5), the obstruction must be "actual and immediate," not merely a temporary inconvenience or momentary delay. *See Zellner v. Summerlin*, 494 F.3d 344, 371–73 (2d Cir. 2007); *Jones v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006). Lawful presence in a roadway or crosswalk – standing alone – does not suffice.

Equally important, § 240.20(5) requires a culpable mental state: intent to cause public inconvenience, annoyance, or alarm, or reckless creation of such a risk. *See People v. Tichenor*, 89 N.Y.2d 769, 775 (1997). Courts therefore reject disorderly-conduct liability where a defendant's conduct is consistent with lawful activity or with a legitimate, non-obstructive purpose. *See e.g.*, *People v. Barrett*, 821 N.Y.S.2d 416, 429–31 (Crim. Ct. N.Y. Cnty. 2006).

On Plaintiff's version of the facts, she entered the crosswalk with the walk signal, observed a vehicle turning into pedestrians who had the right of way, heard screaming suggesting imminent danger, and moved toward the vehicle in an effort to prevent harm. *See* Dkt. No. 1, Compl. ¶¶ 55–61; Dkt. No. 19-1, Novak Dep. Tr. 58:1–12. That account – accepted as true at this stage – describes lawful pedestrian conduct and a response to a perceived emergency, not intentional or reckless obstruction of traffic.

15

Nor does the body-worn camera footage "blatantly contradict" Plaintiff's account. *See Scott*, 550 U.S. at 380. At most, the footage is ambiguous about timing and intent, and it does not establish that Plaintiff was "actually and immediately blocking" vehicular traffic within the meaning of § 240.20(5). Where video evidence is inconclusive and competing inferences may reasonably be drawn, the Court may not credit officers' characterizations over Plaintiff's version of events on a qualified immunity motion. *See Zellner*, 494 F.3d at 369–73.

Thus, even considering § 240.20(5), Defendants cannot establish arguable probable cause as a matter of law. The Court need not reach the outer boundaries of that statute to resolve the qualified-immunity question here. On Plaintiff's version of the facts – supported by her testimony and the statements attributed to the officers – no officer of reasonable competence could have believed that probable cause existed – especially given the Defendants' contemporaneous description of what occurred and the fact that they could not articulate at the time of the arrest any basis for concluding that a crime had been committed. Accordingly, Defendants are not entitled to qualified immunity on Plaintiff's Fourth Amendment false arrest claim.

Defendants briefly suggest an alternative basis for arguable probable cause, contending in a footnote that Plaintiff could have been arrested for criminal mischief in the fourth degree under New York Penal Law § 145.00. *See* Dkt. No. 20, at 18 n.3. That argument fares no better.

Section 145.00 requires intentional or reckless damage to property without right or justification. Plaintiff alleges – and for present purposes the Court must accept – that any contact she made with the vehicle occurred in an effort to prevent imminent harm to pedestrians lawfully in the crosswalk. *See* Dkt. No. 1, Compl., ¶¶ 58–63. New York law expressly provides that conduct otherwise constituting a criminal offense is "justifiable and not criminal" when it is "necessary as an emergency measure to avoid an imminent public or private injury." N.Y. Penal

16

Law § 35.05(2). Whether Plaintiff's actions were necessary to avert imminent harm turns on disputed questions of perception, timing, and intent that cannot be resolved in Defendants' favor at this stage. Critically, Defendants again point to no contemporaneous statement or observation suggesting that they believed Plaintiff had damaged property or acted with the *mens rea* required by § 145.00.

Indeed, Plaintiff alleges that, even after the incident, officers described her conduct to emergency medical personnel not as criminal, but as that of a pedestrian who had been struck while "just walking." Dkt. No. 1, Compl. ¶ 63. Defendants themselves do not contend that Plaintiff caused any damage to the vehicle. Their Rule 56.1 counterstatement expressly acknowledges that they are "not aware of damage caused to the [driver's] vehicle by plaintiff banging on the front hood of the vehicle." Dkt. No. 26 ¶ 47. That admission further underscores the absence of any articulable basis for believing that she had violated § 145.00. On Plaintiff's version of events, Defendants lacked any articulable basis – mistaken or otherwise – to believe that § 145.00 had been violated.

In sum, accepting Plaintiff's version of events as true, this is not a case in which officers made a reasonable but mistaken judgment in a fast-moving situation about whether specific conduct satisfied the elements of a particular offense. On Plaintiff's version of the facts, Defendants arrested her without knowing why they were doing so and after describing her conduct to third parties in completely non-criminal terms. No reasonable officer could view such an arrest as supported by arguable cause. Qualified immunity does not extend that far.

Because Defendants have failed to establish arguable probable cause as a matter of law, the Defendant Officers are not entitled to qualified immunity on Plaintiff's Fourth Amendment false arrest claim. Defendants' motion for summary judgment on this claim is therefore denied.

### ii. Plaintiff's First Amendment Retaliation Claim

Defendants also move for summary judgment on Plaintiff's First Amendment retaliation claim solely on the ground that the individual officers are entitled to qualified immunity. They do not move for summary judgment on the merits of the retaliation claim itself. Accordingly, the Court does not decide whether Plaintiff has established retaliatory arrest on the merits. The only question presented is whether, accepting Plaintiff's version of events as true, Defendants have shown that they are entitled to qualified immunity as a matter of law. They have not.

It is clearly established that the First Amendment prohibits government officials from arresting an individual in retaliation for protected speech. *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Where the alleged retaliatory action is an arrest, the Supreme Court has held that the existence of probable cause will generally defeat such a claim. *Nieves v. Bartlett*, 587 U.S. 391, 405 (2019). That principle rests on causation, not immunity doctrine. As the Court explained, "probable cause speaks to the objective reasonableness of an arrest," and its presence "will suggest" that the arrest would have occurred regardless of any retaliatory animus. *Id.* at 402, 404–05.

The general rule that the existence of probable cause defeats a First Amendment retaliatory-arrest claim has no application here. As discussed at length in connection with Plaintiff's Fourth Amendment claim, *see supra* Section III(a)(i), Defendants have not established arguable probable cause on Plaintiff's version of events. That conclusion rests in part on the complaint's allegations that officers contemporaneously described Plaintiff as a pedestrian victim, could not articulate any basis for her arrest, and later acknowledged that they did not know why she had been arrested. *See* Dkt. No. 1, Compl. ¶¶ 62–63, 69, 75, 92.

Because arguable probable cause is absent on Plaintiff's version of events, the inference on which *Nieves* relies – that the arrest would have occurred anyway absent protected speech – is

18

unavailable at this stage. The same disputed facts that defeat qualified immunity on Plaintiff's Fourth Amendment false arrest claim foreclose qualified immunity on Plaintiff's First Amendment retaliation claim. *See Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012).

Defendants nevertheless invoke *Nieves* as a categorical bar to Plaintiff's claim. Dkt. No. 20, at 19–20. That argument misunderstands both the function of the probable-cause rule and the reason the Supreme Court crafted a narrow exception to it.

In *Nieves*, the Supreme Court adopted the probable cause rule to address a recurring "problem of causation" in retaliatory-arrest cases – namely, the difficulty of determining whether an arrest was caused by an officer's hostility toward protected speech or by the arrestee's potentially criminal conduct. *Nieves*, 587 U.S. at 402. Where probable cause is present, it "will suggest" that the arrest would have occurred regardless of any retaliatory motive; where probable cause is absent, that inference cannot be drawn. *Id.* But here, Defendants have not established that they had probable cause to arrest, as they did in *Nieves*. They have not even established that they had arguable probable cause to arrest. For that reason, *Nieves* does not provide a basis for qualified immunity.

At the same time, the Supreme Court has recognized that an unyielding application of the probable-cause rule would pose particular dangers in protest-policing contexts. The Court explained that in many such settings – especially those involving minor or rarely enforced offenses – officers routinely exercise discretion not to arrest. *Id.* at 406–07. In that circumstance, a rigid probable-cause bar would permit officers to arrest a speaker they dislike while leaving others untouched, and then justify the arrest by pointing to a technical violation that ordinarily goes unenforced. *Id.* To guard against that risk, the Court crafted a narrow exception.

The narrow exception recognized in *Nieves* applies only where probable cause is established and would otherwise categorically bar a retaliatory-arrest claim. *Id.* at 406–07. In that circumstance – and only in that circumstance – the exception permits a plaintiff to proceed by pointing to objective evidence of selective enforcement, such as evidence that similarly situated individuals not engaged in protected speech were not arrested. *Id.* The exception does not operate as an affirmative defense, and it does not confer immunity on officers where probable cause has not been established.

Because Defendants have not shown that probable cause, or even arguable probable cause, exists as a matter of law, the Court need not – and does not – reach the narrow exception recognized under *Nieves*. That exception becomes relevant only if arguable probable cause is otherwise established and would bar a retaliatory arrest claim in the first instance. Here, Defendants have not made the necessary threshold showing.

For completeness – and to make clear the nature of the protected activity at issue – the Court briefly summarizes Plaintiff's theory of retaliation as alleged. Plaintiff's theory of retaliation rests on her engagement in speech critical of police conduct immediately preceding her arrest. Plaintiff alleges that, after another volunteer safety marshal wearing a neon vest was arrested, she asked Defendant Zuber where officers were taking that marshal, persisted after being told it was "none of [her] business," and then requested Defendant Zuber's badge number while asking nearby protesters to record it. Dkt. No. 1, Compl. ¶¶ 55–58. Plaintiff further alleges that, as protesters filmed the arrest, Defendant Zuber called them "fucking morons" and threatened mass arrest, stating that he "had enough handcuffs for everyone." *Id.* ¶ 54. According to the complaint, Plaintiff and the other volunteer safety marshal wearing a bright vest were the only protesters arrested. *Id.* ¶ 72.

20

Conduct of the sort Plaintiff alleges – verbal challenges to police authority, requests for identifying information, and efforts to facilitate public recording of police activity – falls squarely within the core of protected First Amendment activity. *See City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Such activity directly implicates the First Amendment's central concern with public oversight of governmental power – particularly where, as alleged here, the speech concerns the conduct of law enforcement officers engaged in crowd control at a public protest. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034–35 (1991).

Whether Plaintiff can ultimately establish retaliatory motive or selective enforcement is a merits determination the Court does not reach on Defendants' qualified-immunity motion. At this stage, because Defendants have not established arguable probable cause, and because the conduct alleged is protected speech, Defendants are not entitled to qualified immunity. *Nieves* provides no basis for qualified immunity at this stage. Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim is denied.

### b. Plaintiff's Claims Under New York Law

#### i. False Arrest

Defendants move to dismiss Plaintiff's New York common-law false arrest claim under Rule 12(b)(6). The Court therefore accepts Plaintiff's well-pleaded allegations as true and draws all reasonable inferences in Plaintiff's favor.

A § 1983 claim for false arrest, based on the Fourth Amendment right of an individual to be free from unreasonable seizures "is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). Plaintiff asserts

21

a New York common law false arrest claim against the individual Defendant Officers based on the same arrest that underlies her federal Fourth Amendment claim.

Under New York law, to prevail on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (internal quotation marks omitted); *Broughton v. State*, 37 N.Y.2d 451, 456–58 (1975).

Defendants do not dispute that the first three elements are satisfied. *See* Dkt. No. 20, Defs.' Mem. L. Supp. Mot. to Dismiss, at 21–22. The sole issue, therefore, is whether Plaintiff's confinement was "otherwise privileged," which turns on whether Defendants had probable cause to arrest her. *Broughton*, 37 N.Y.2d at 456.

For the reasons already discussed in detail in the qualified-immunity analysis, *see supra* Section III(a)(i), Plaintiff has plausibly alleged that no probable cause existed for her arrest. The Court therefore does not repeat that analysis here. Accepting Plaintiff's allegations as true, officers arrested her while she was receiving medical treatment after being struck by a vehicle, were unable to articulate any basis for the arrest, described her to third parties as a pedestrian victim, and later acknowledged that they did not know why she had been arrested. *See* Dkt. No. 1, Compl. ¶¶ 62–63, 69, 75, 92.

At the pleading stage, those allegations more than suffice to state a claim that Plaintiff's confinement was not privileged under New York law. *See Jocks*, 316 F.3d at 135. Accordingly, Defendants' motion to dismiss Plaintiff's New York common-law false arrest claim is denied.

### ii. Negligent Hiring, Retention, Training, and Supervision

Plaintiff also asserts a claim under New York law against the City for negligent hiring, retention, training, and supervision of the individual Defendant Officers.[2] This claim fails as a matter of law.

To state a claim for negligent hiring, retention, training, or supervision under New York law, a plaintiff must plead, in addition to the elements of negligence, that: "(1) the tort-feasor and the defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citation modified). In addition, "a claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of his or her employment." *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013).

Plaintiff's negligent hiring, retention, training, and supervision claim fails for two independent reasons: (1) Plaintiff's own allegations demonstrate that the individual Defendants were acting within the scope of their employment at all relevant times; and (2) Plaintiff fails to plausibly allege that the City knew or should have known of any Defendant's propensity for the conduct alleged.

*First,* Plaintiff's own allegations establish that the Defendant Officers were acting squarely within the scope of their employment as NYPD officers throughout the events at issue. Plaintiff alleges that the Individual Defendants were NYPD officers acting "under color of state law" and

---

[2] Plaintiff does not assert a municipal-liability claim against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Her claims against the City arise solely under New York law.

"within the scope of their employment by Defendant City of New York and the New York City Police Department." Dkt. No. 1, Compl. ¶¶ 13, 125.

The complaint describes a continuous sequence of core law enforcement activities undertaken by on-duty officers in response to a public demonstration and a street-level incident, including monitoring and supervising a protest, exercising arrest authority, applying handcuffs, maintaining custody, controlling the scene, and coordinating with emergency medical personnel. *See id.*, ¶¶ 28–31, 49, 52–54, 60–67, 73–81.

Plaintiff specifically alleges that she was placed under arrest by NYPD officers and remained handcuffed while being transported to the hospital and while receiving medical treatment. *Id.*, ¶¶ 64–66. Plaintiff further alleges that, during this period, Defendant Officers spoke with emergency medical personnel regarding the circumstances of the incident and Plaintiff's arrest. *Id.*, ¶¶ 62–63, 75.

These allegations describe paradigmatic law enforcement functions. At no point does the complaint allege that any Defendant acted for personal reasons, pursued a private objective, or deviated from their official roles as on-duty police officers. Because Plaintiff does not plausibly allege that any Individual Defendant acted outside the scope of his or her employment, Plaintiff's negligent hiring, retention, training, and supervision claim fails on that basis alone. *See Velez*, 730 F.3d at 136–37; *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 336 (S.D.N.Y. 2017).

*Second,* Plaintiff fails to plausibly allege that the City knew or should have known of any officer's propensity for the challenged conduct. The complaint contains only generalized allegations asserting that the City negligently hired, retained, trained, and supervised the Individual Defendants. *See* Dkt. No. 1, Compl. ¶¶ 127–131. It does not plead any facts identifying prior misconduct by any Defendant, prior civilian complaints, disciplinary findings, internal

24

investigations, or any history of similar conduct. Nor does Plaintiff allege any facts suggesting that the City had notice before the events at issue of any risk posed by any Individual Defendant. *See id.*

The complaint likewise does not identify any specific training deficiency, supervisory failure, or hiring decision that allegedly caused Plaintiff's injury. Instead, Plaintiff relies on conclusory assertions of municipal fault untethered to factual allegations showing notice, foreseeability, or causation. This pleading is insufficient as a matter of law. *See Ndoye v. City of New Rochelle*, No. 23-CV-3805 (PMH), 2024 WL 308221, at \*4–5 (S.D.N.Y. Jan. 26, 2024).

Because Plaintiff does not plausibly allege either (1) that Defendants acted outside the scope of their employment, or (2) that the City knew or should have known of any Defendant's propensity for the conduct alleged, Plaintiff has failed to state a claim for negligent hiring, retention, training, or supervision under New York law. Accordingly, Defendants' motion to dismiss this claim is granted.

### Conclusion

For the foregoing reasons, Defendants' motions are GRANTED IN PART and DENIED IN PART.

Defendants' motion for summary judgment seeking to dismiss Plaintiff's federal claims on the ground of qualified immunity is DENIED in its entirety.

Defendants' motion to dismiss Plaintiff's New York common-law false arrest claim is DENIED, and Defendants' motion to dismiss Plaintiff's negligent hiring, retention, training, and supervision claim is GRANTED.

The Clerk of Court is directed to terminate the motions pending at docket numbers 16 and 17. This constitutes the decision and order of the Court. It is a written decision.

Dated: February 2, 2026

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

26